**FRANK BRISCOE CO., INC., Plaintiff,**

v.

**The TRAVELERS INDEMNITY CO., et al., Defendants.**

Civ. A. No. 93–5222.

United States District Court,
D. New Jersey.

Sept. 5, 1995.

---

Jonathan L. Goldstein, Robert S. Raymar, Matthew E. Moloshok, Hellring, Lindeman, Goldstein & Siegal, Newark, NJ, for plaintiff.

Frederic S. Kessler, Tompkins, McGuire & Wachenfeld, Newark, NJ, Arthur S. Friedman, Susan J. Schwartz, Robert A. Scher, Friedman, Wang & Bleiberg, New York City, for defendants.

## AMENDED OPINION

WOLIN, District Judge.

This case requires the Court to interpret an agreement, styled as an Agreement for Disposition of Collateral ("ADC"), in order to determine the respective rights of the parties. Plaintiff contends that it is owed approximately $400 million in accrued interest. Defendant denies any indebtedness to plaintiff and counters that plaintiff remains indebted to defendant. Despite the $400 million financial gulf that separates the parties, both parties agree that the contract is clear and unambiguous. This linguistic gymnastic is indisputably only possible in the realm of legal advocacy.

## BACKGROUND

Plaintiff Frank Briscoe Co., Inc. ("Briscoe") is a closely-held construction company, which has conducted business since its founding in Newark in 1920.[1] Briscoe has per-formed several noteworthy construction projects including the Gateway One and Gateway Two office buildings in Newark, New Jersey, Giants Stadium and the Meadowlands Race Track in East Rutherford, New Jersey and the New Jersey College of Medicine and Dentistry. Since the early 1970s The Travelers Indemnity Company ("Travelers") has provided Briscoe with payment and performance bonds. In return, Briscoe executed a General Agreement of Indemnity in favor of Travelers. (ADC at 1).

Beginning in late 1979 and early 1980, Briscoe was in severe financial distress and unable to meet its obligations. Briscoe told Travelers that it could not complete its contracts without Travelers' financial assistance. (ADC at 1). Faced with either paying millions of dollars on its payment and performance bonds or assisting Briscoe financially, Travelers chose to assist Briscoe financially. As a result, beginning on March 14, 1980, Travelers issued a series of loans to Briscoe totaling approximately $24 million in exchange for a security interest in all of Briscoe's assets. (ADC at 2). These loan agreements and their supplements and amendments are known collectively as the "Loan and Security Agreement." *Id.*

In conjunction with the execution of the Loan and Security Agreement, the executors of the estate of William F. Kelly, Jr., owner of eighty-one percent (81%) of the common stock of Briscoe, agreed to guarantee the Briscoe loans and pledged all of Kelly's stock in Briscoe as security. (ADC at 2).

Under the terms and conditions of the Loan & Security Agreement interest on the loans was due monthly. It is undisputed that Briscoe failed to make all of its monthly interest payments. Later, in accordance with the terms and conditions of the Loan and Security Agreement, Travelers made a demand upon Briscoe for payment of $22 million in principal and $6 million in accrued interest. (ADC at 3). Unable to repay Travelers, Briscoe defaulted on its repayment of the loan. In the preamble to the

---

1. Although Briscoe has been alive as a company since its founding in 1920 it has not entered into any new construction projects since 1982.

ADC, Briscoe acknowledges that it is in default. Page 3 of the ADC states: "FBC [2] has acknowledged that demand for payment has properly been made, an Event of Default has occurred under the Loan and Security Agreement, and Travelers has properly declared all loans owing Travelers from FBC to be forthwith due and payable." (ADC at 3).

At this time Travelers, as a secured creditor, succeeded to possession of all of the assets of Briscoe which had been pledged as security under the Loan & Security Agreement. As a secured creditor, Travelers had the right to possess and liquidate all of Briscoe's assets. Travelers, in fact, chose to exercise its rights as a secured creditor and to liquidate the assets of Briscoe.

Faced with bankruptcy and/or Travelers' imminent liquidation of all of its assets, Briscoe expressed that it was "desirous of participating in the disposition of the Collateral." (ADC at 3). Briscoe represented to Travelers that it would "devote its best efforts and substantially all of its time and attention to the completion of performance of [its then outstanding construction] contracts and to the disposition of such Collateral as Travelers may determine." (ADC at 3–4).

The proposition was both appealing and advantageous to Travelers. Clearly, Briscoe was in the best position to maximize the liquidation of the collateral. This is especially true because many of Briscoe's assets were in the form of legal claims against the owners of certain properties who had failed to pay Briscoe. Therefore, Travelers recognized that Briscoe was best suited to pursue these claims. Travelers entered into the ADC to facilitate this arrangement with Briscoe.

The focus of the present dispute is whether the ADC required Travelers to accrue interest on behalf of Briscoe. Under the ADC Briscoe collected on third-party claims and/or liquidated certain assets and then deposited the money into a Travelers bank account. For its efforts, Briscoe claims that it is entitled to all interest that was or should have been accrued on this money. Briscoe's

theory of the case identifies Travelers as a fiduciary who acted on behalf of its principal, Briscoe. Under Briscoe's theory: "What the ADC in fact created was a *pledge* of the proceeds, with Briscoe as the pledgor and Travelers as the pledgee, to secure Briscoe's obligations to Travelers." (Briscoe Opp.Br. at 39; emphasis in original). As a fiduciary, Briscoe submits that Travelers was merely holding Briscoe's money with an obligation to invest the money prudently. Because the money remained the property of Briscoe, it asserts that any interest earned on the money would also belong to Briscoe.

Travelers disputes its fiduciary role and characterizes Briscoe as a debtor that defaulted on its obligations to its secured creditor. Because Briscoe defaulted under the loan agreements, Travelers contends that Briscoe forfeited its ownership in the assets. Under Travelers' theory, the ADC is an agreement through which Briscoe was hired solely as an agent for a fee to assist Travelers in the liquidation of its assets. Therefore, according to Travelers, all of the money deposited under the ADC belonged to Travelers, which it could invest or not invest as it saw fit. Thus, because the money is the sole property of Travelers, it follows that any interest earned on the money would also belong to Travelers. Likewise, under this scenario, Travelers is only obligated to pay Briscoe the fee identified in the ADC and nothing more.

Briscoe has collected and deposited with Travelers more than $84 million pursuant to the ADC. Because the program has continued for more than thirteen years, the amount of interest at stake is enormous.[3] According to Briscoe interest on gross proceeds would entitle it to approximately $400 million. According to Travelers, Briscoe has, by virtue of program and Court-ordered advances, already received full payment for its services under the ADC. In fact, Travelers claims that Briscoe may owe some money to Travelers.

---

2. The ADC refers to Briscoe as "FBC."

3. The ADC agreement contemplated performance within three years. Its continued existence has exacerbated this vexatious litigation.

On November 23, 1993, more than eleven years after entering into the ADC, Briscoe filed this lawsuit against Travelers. The ten-count complaint accuses Travelers of breaching the agreement and seeks recovery of more than $396 million under the ADC. Travelers answered by claiming, *inter alia*, that Briscoe is estopped from collecting any money under the ADC because Briscoe defaulted under the ADC.

On June 20, 1995, this matter was tried to the bench for two days. Three witnesses testified. Briscoe's President Gabriel Calafati, chief negotiator on behalf of Briscoe, testified on behalf of Briscoe. Former Travelers assistant director Howard Loeffler, who negotiated the ADC on behalf of Travelers, also testified on behalf of Briscoe. Travelers called attorney Mark Larner, Esq., as its only witness. Larner was the scrivener of the ADC. Following the bench trial, the parties submitted to the Court 136 exhibits and hundreds of pages of deposition testimony.

The central issues to be resolved by the Court are:

1. Is Travelers a fiduciary holding the money on behalf of Briscoe?

2. Or, is Travelers a secured creditor of a defaulted debtor, that owns all of the money deposited under the ADC?

3. Are the parties akin to partners under the ADC?

4. Or, is Briscoe an agent hired by Travelers to assist in the disposition of the collateral?

The answers to these four questions are dispositive of whether Travelers or Briscoe is entitled to keep the interest, if any, earned on the money deposited by Briscoe under the ADC.

## OVERVIEW

### A. Governing Law

This matter is before the Court on diversity jurisdiction.[4] Paragraph 26 of the contract at issue provides that New Jersey law should govern its interpretation. The parties do not dispute that the law of New Jersey governs. As a result, the Court will apply the law of New Jersey in its interpretation of the contract.

■ Third Circuit and New Jersey precedent teaches that to decide whether the ADC is ambiguous, the Court must examine the conduct of the parties leading up to the signing of the ADC and the conduct of the parties after the execution of the ADC. "To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather 'we hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.'" *American Cyanamid v. Fermenta*, 54 F.3d 177, 181 (3d Cir.1995) (citations omitted). "Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." *Id.* "Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *Id.*

■ It is also well-established, as a matter of law, that the Court cannot rewrite the contract or alter it simply because its results turned out differently than the parties expected. *See e.g., Pennbarr Corp. v. Ins. Co. of N. America*, 976 F.2d 145, 151 (3d Cir. 1992) (the Courts "may not make a different or better contract than the parties themselves saw fit to enter into"); *Mellon Bank N.A. v. Aetna Bus. Credit Inc.*, 619 F.2d 1001, 1009 & n. 8 (3d Cir.1980) ("commercial paries are free to contract as they desire" and are thereafter "bound by the terms of their contract."); *Air Master Sales Co. v. Northbridge Park Co–Op, Inc.*, 748 F.Supp. 1110, 1115–16 (D.N.J.1990) ("In construing the terms of a contract, a court may not rewrite a contract to favor either party ... a change of mind does not bear upon the validity or existence of the contract."); *Dunkin' Donuts of America, Inc. v. Middletown Do-*

4. Briscoe is a New Jersey corporation and Travelers is a Connecticut corporation.

*nut Corp.*, 100 N.J. 166, 173–74, 182–85, 495 A.2d 66 (1985) (Courts cannot apply equity principles to modify express contractual terms; even when application thereof arguably may be "disproportionately harsh" to one party and result in "an inappropriate windfall" to the other.).

█ Thus, to fulfill its warrant, the Court will now embark on the formidable task of first examining the language of the ADC and then examining the immense body of extrinsic evidence offered by the parties. The extrinsic evidence falls into two discrete categories: pre-execution conduct and post-execution conduct. The Court will examine each in turn.

## B. History of the Parties' Negotiations

The parties spent more than a year painstakingly negotiating and drafting the provisions of the ADC. Both sides were represented by counsel during the negotiations. Travelers' officer-in-charge Loeffler negotiated the agreement on behalf of Travelers.[5] Briscoe's then executive vice-president, Calafati, negotiated on behalf of Briscoe. The scrivener of the ADC was Larner.

## C. Overview of the ADC Program

It is agreed that the ADC establishes what the parties have termed the "Program" pursuant to which Briscoe would assist Travelers in liquidating Briscoe's assets which had been put up as security for loans from Travelers. Much of this work required Briscoe to pursue construction claims in litigation nationwide. In addition, Briscoe attempted to liquidate certain tangible assets.

Travelers began the Program by paying Briscoe a $3 million fee for its efforts. (ADC ¶¶ 9.2, 9.5). Thereafter, Travelers "in its sole and absolute discretion" was to advance funds to Briscoe "reasonably required for the costs and expenses necessary" for the liquidation of the collateral. (ADC ¶¶ 8.1, 8.5(a)). These funds are known as Program Advances. In addition, Travelers "in its sole

and absolute discretion" could loan additional money to Briscoe. (ADC. ¶ 10.2). These funds are known as Non–Program Loans. As of February 1995, Travelers had made Program Advances of more than $45.4 million and Non–Program Loans of more than $6.2 million. (Calafati Aff.Ex. E).[6]

The ADC does not require Briscoe to pay interest on Program Advances. However, the ADC does require Briscoe to pay interest of 15% per annum on Non–Program Loans after a grace period of eighteen months. Interest is also expressly referenced in the ADC with respect to Briscoe's debt to Travelers under the Loan and Security Agreement, which continues to accrue interest. (ADC ¶¶ 12.1, 22).

The ADC requires Briscoe to devote itself immediately and entirely to the liquidation of its assets. (ADC ¶¶ 3.1(b), 3.2(a), 18.1(e)). In return for its efforts, Briscoe would not only receive funding from Travelers and continued employment for Briscoe employees, but at the end of the Program, subject to numerous conditions, Briscoe was to receive an "Entitlement." This entitlement is a contingent dollar payment calculated by application of a specific formula detailed in the ADC. (ADC ¶¶ 9.1, 11).

## D. The Language of the ADC

### 1. Completeness of the Contract

The starting point for any lawsuit involving the interpretation of a contract is the contract itself. Both parties claim that the agreement is unambiguous and fully expresses the agreement reached between Travelers and Briscoe. Mr. Calafati testified at his deposition:

Q: Is there anything missing from the [ADC]?

A: Anything missing in it? I don't think so.

Q: Is there anything mistaken or wrong in it, in relation to what you and Travelers agreed to?

---

**5.** It is undisputed that Loeffler, while he was the lead negotiator on behalf of Travelers, had no authority to make final decisions on behalf of Travelers.

**6.** References to affidavits submitted by the parties appear in the following form: "[Name] Aff. at [paragraph/exhibit number]."

A: I believe if you study the agreement it's all in there.

Q: So the agreement fairly sets forth, from your point of view, everything that was agreed to between you and Travelers?

A: The ADC?

Q: Yes, the ADC, is that correct?

A: It provided for everything basically that we agreed on, yes.

(Calafati Dep. at 52–53).[7] Travelers also stated that the ADC is unambiguous and fully expresses the agreement reached between the parties. (Travelers Br. at 6–8).

In addition the ADC itself expressly proclaims that it is complete and self-contained. Paragraph 35 states:

*Complete Agreement.* This Agreement contains the entire agreement of the parties and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect.

With this information in hand, the Court will painstakingly examine the salient provisions of the sixty-one-page ADC in an effort to determine whether or not the ADC is ambiguous and to interpret the meaning of the ADC.

## 2. The Preamble

The preamble to the ADC recites the history of the parties' relationship including the fact that: (1) Travelers, as a surety, executed numerous payment and performance bonds for Briscoe; (2) Briscoe executed a General Agreement of Indemnity in favor of Travelers; (3) Briscoe was unable to complete its construction contracts without financial assistance from Travelers; (4) Travelers loaned Briscoe approximately $24 million commencing in 1980.

Significantly, on page 3 of the ADC Briscoe acknowledges that Travelers has rightly made a demand for repayment of its loans and Briscoe defaulted on its promise to repay Travelers. Briscoe's argument in its brief that there was no default under the Loan and Security Agreement until a demand for the

principal was made by Travelers on July 27, 1982 is factually erroneous. (Briscoe Br. at 18, n. 9). Each note under the Loan and Security Agreement specifically provides that interest is due monthly. Once Briscoe failed to make a monthly payment of interest due it was in default under the Loan and Security Agreement. That formal demand for payment of the principal by Travelers belatedly occurred on July 27, 1982 is immaterial.

The preamble to the ADC then continues that because Briscoe defaulted under the Loan and Security Agreement, Travelers was entitled to possess and own all of the collateral pledged by Briscoe as security for the loan. Likewise, the preamble empowers Travelers to dispose of the collateral in a commercially reasonable fashion.

The next paragraph of the preamble is very illuminating. The ADC states: "FBC is desirous of participating in the disposition of the Collateral. . . ." The use of the adjectival form of the word "desires" indicates that Briscoe was asking Travelers for an opportunity to participate in the disposition of the collateral. This language suggests that Travelers and Briscoe were not parties of equal stature at the time the ADC was drafted. Later the ADC states: "Travelers, upon the terms and subject to the conditions hereinafter set forth, is willing to allow FBC to participate in the disposition of the Collateral." Again, the use of the word "allow" indicates that Travelers was granting permission to Briscoe. These words are hardly the words used by parties whose bargaining position rests on equal footing, such as partners. Rather, these are words used by parties of disproportionately unequal status such as a defaulting debtor and a secured creditor. A fair inference from the language chosen by the parties is that Travelers was in a stronger position than Briscoe at the time the ADC was drafted.

The unequal bargaining position of the parties is further reflected in the next paragraph of the ADC which states: "the parties acknowledge that it is not commercially un-

---

**7.** References to deposition testimony submitted by the parties are in the following form: [Name] Dep. at [Page number].

reasonable for FBC to participate in the disposition of the Collateral." And, the following paragraph states: "FBC has represented that it will devote its best efforts and substantially all of its time and attention to the completion of performance of FBC's contracts and to the disposition of such Collateral as Travelers may determine." This precise language is language of direction and indicates that Briscoe is acting *on behalf of Travelers,* and not vice-versa. This is the type of language one would expect in an agreement between a defaulting debtor and secured creditor. It is not language one would expect in an agreement between equal partners.

In discussing the relative strengths of Travelers and Briscoe, the Court does not mean to intimate that the ADC is a contract of adhesion. Nothing could be further from the truth. The ADC was carefully negotiated and drafted with input from both parties. And both parties received significant benefits under the contract. In fact, Briscoe, arguably, benefitted more from the ADC than Travelers did from the ADC. Briscoe received the following benefits under the ADC:

1. A $3 million minimum guarantee without limitation as to its use.

2. The ability to forgo immediate repayment on a $24 million loan due to Travelers.

3. The ability to receive significant sums of money—interest-free—from Travelers to aid Briscoe in pursuing third-party construction claims. (Program advances).

4. The ability to receive additional loans from Travelers interest-free for eighteen months. (Non-program loans).

5. Complete forbearance on the debt owed to Travelers if the ADC program did not garner sufficient money.

6. The ability to complete its ongoing construction projects and to maintain its status in the construction industry.

Travelers also benefitted under the ADC. Travelers received the following benefits:

1. By assisting Briscoe in the completion of its ongoing construction projects, Travelers avoided having to pay millions of dollars on payment and performance bonds.

2. By allowing Briscoe to assist in the disposition of the collateral, especially the pursuit of third-party construction claims, Travelers maximized its ability to be repaid fully by Briscoe.

Thus, there can be no question that the ADC is a bilateral contract, negotiated by both parties, that offered benefits to both Travelers and Briscoe.

**3. Section 1 of the ADC**

Paragraph 1 of the ADC requires Briscoe to "assemble and turn over to Travelers, possession of that part of the Collateral, consisting generally of cash and cash equivalents, set forth on Schedule A." The words "turn over to Travelers" indicate that Briscoe is surrendering all title and ownership of such collateral to Travelers. Had the parties intended for Travelers to merely hold such collateral as a fiduciary acting on behalf of Briscoe, paragraph 1 of the ADC would require Briscoe to "place" the collateral in Travelers' possession, or restrictive words to that effect.

Briscoe argues that use of the word "possession" in Paragraph 1 implies that Travelers merely holds the collateral on behalf of Briscoe. This argument belies common experience. Possession of cash is the same as ownership. Absent an express agreement to the contrary that would make the possessor of the cash act as a fiduciary, none can be implied. The ADC contains no express fiduciary agreement. In fact, the word "fiduciary" does not appear anywhere in the ADC. Therefore, the use of the word "possession" is an insufficient basis for this Court to infer that Travelers was holding the money as a fiduciary acting on behalf of Briscoe.

In addition, Briscoe argues that Travelers does not own the proceeds of the disposition of the collateral because the words "ownership" or "own" do not appear in Section 1. The Court disagrees. The absence of these specific terms is not sufficient to conclude that Travelers has only a possessory right to the proceeds of the disposition of the collateral. The ADC must be read as whole and

in context to determine whether or not Travelers owns the proceeds from the disposition of the collateral.

#### 4. Section 2 of the ADC

Paragraph 2.5 and Paragraph 3.1(d) both state: "The proceeds of the disposition of the Collateral shall be under the control of and paid to Travelers." In fact, this phrase is repeated throughout the ADC. The common understanding of this language further indicates that Briscoe surrendered all title and ownership to proceeds of the disposition of the collateral to Travelers. Moreover, this language is consistent with the rights of a secured creditor after a debtor has defaulted. After default, a secured creditor has the right to apply the proceeds from the liquidation of collateral to its liquidation costs and then to the debt.

#### 5. Section 6 of the ADC

The Court's conclusion that Travelers did not act as a fiduciary on behalf of Briscoe is made abundantly clear in section 6 of the ADC which states that Briscoe can only sue Travelers for actual fraud. Paragraph 6.3 states: "[T]here will probably be a substantial deficiency due to Travelers, and because Travelers, as provided in paragraph 12.4, has agreed to a plan providing for the cancellation of the deficiency, FBC should have no claim or cause of action against Travelers with regard to the manner of the collection and/or disposition of the Collateral, except for actual fraud on the part of Travelers." If Travelers were a fiduciary vested with the responsibility of investing the proceeds of the disposition of the collateral on behalf of Briscoe, surely the ADC would provide some remedy to Briscoe if Travelers invested the money imprudently. The absence of such a provision and the express waiver of all claims except those based on actual fraud impede Briscoe's claim that Travelers is acting solely as a fiduciary.

#### 6. Section 8 of the ADC

When the ADC is read in conjunction with the execution documents signed concurrently with the ADC, it is evident that all of the proceeds from the disposition of the collateral were to be placed in a single bank account, owned by Travelers. Paragraph 8.4 of the ADC provides that Travelers would make Program Advances to Briscoe from this same bank account. Paragraph 8.4 further states: "Any funds in such account shall be the property of and belong to Travelers and shall be deemed advanced only if and at such time or times Travelers shall disburse funds therefrom." Paragraph 8.4 thus makes it beyond dispute that "any funds" in this bank account are the "property of and belong to Travelers." The Court is hardpressed to think of any words that could make Travelers' ownership of the funds more apparent.

Briscoe argues that the terms "funds" and "proceeds" have discrete meanings under the ADC. To Briscoe's way of thinking, "proceeds" refers to all of the money deposited by Briscoe under the ADC; and "funds" refers to money flowing from Travelers to Briscoe, such as Program Advances. Under this rationale, Paragraph 8.4 merely vests Travelers with ownership over "funds," that is, the money Travelers advances to Briscoe. Briscoe argues that Paragraph 8.4, because it uses the word "funds" and not the word "proceeds," does not vest Travelers with ownership over all of the money deposited under the ADC.

The Court finds Briscoe's argument unpersuasive. The fact is that under the ADC *all* of the money deposited by Briscoe and *all* of the money Travelers advanced to Briscoe were placed in a single bank account. Paragraph 8.4 expressly states that Travelers is the owner of the money in this bank account. No other interpretation of Paragraph 8.4 is consistent with the facts of this case. Moreover, Travelers does not need to state that it is the owner of money it advances to Briscoe. Such a proposition is obvious. To read Paragraph 8.4 to provide that Travelers only owns the money it advances to Briscoe would make this paragraph inexpedient surplusage.

Section 8 of the ADC, which deals with Program Advances, is also important to consider when analyzing the issue of interest. Nowhere in Section 8—or any place else in the ADC—is there any requirement that Briscoe pay interest on Program Advances. Likewise, there is no express statement that

Program Advances are interest-free. Rather, Section 8 simply does not discuss interest. In contrast, in Section 10 of the ADC, which deals with Non–Program Loans, there is an express requirement that Briscoe pay interest of 15% per annum after an 18 month grace period. Likewise, in Paragraph 9.4 there is a requirement that Travelers pay interest to Briscoe on estimated net proceeds to be paid to Briscoe.

Thus, under the ADC, when the parties intended for there to be an interest requirement they expressly provided for it. When the parties did not intend for there to be an interest requirement, the issue of interest was not mentioned. It logically follows that the absence of an explicit direction to add interest or earnings to Briscoe's entitlement is not an accident. Rather, the parties' silence on this issue must be construed as deliberate. The maxim *expressio unius est exclusio alterius* is applicable.[8] The expression of interest in several parts of the ADC necessarily means the exclusion of interest where the ADC is silent. The Court returns to the admonition that contracts must be read as a whole. And the structure and organization of a contract can often be as revealing as the individual words chosen by the draftsman.

### 7. Section 9 of the ADC

With this understanding of the structure of the ADC in hand, the Court turns to Paragraph 9 of the ADC, which deals with how much money Travelers must pay to Briscoe at the end of the Program. Paragraph 9.1 states that at the end of the program, if Briscoe is not in default, Briscoe will receive 50% of the "net proceeds realized by Travelers from the collection and/or disposition of the Collateral...."

Briscoe asks this Court to interpret the word "realized" as synonymous with "with interest." In its brief Briscoe argues that use of the word "realized" indicates that Briscoe is entitled to 50% of all sums actually received by Travelers, whether from the disposition of the collateral or from interest. (Briscoe Opp.Br. at 21–22).[9]

Travelers argues that the word "realized" is synonymous with the word "received." Therefore, Travelers argues that paragraph 9.1 entitles Briscoe to 50% of the amount of money received by Travelers from Briscoe under the program.

The Court finds that "realized" is synonymous with "received." This interpretation is confirmed by the definition of "net proceeds realized" in Paragraph 9.3 of the ADC, which states: "Net proceeds realized from the collection and/or disposition of the Collateral shall mean and include all sums *actually received* by Travelers from the collection and/or disposition of the Collateral ... together with the approximate sum of $1.78 million *received by* Travelers from FBC prior to the date hereof, less the sum of the following: ...." (Emphasis added). Thus, the ADC itself answers the dispute. The term "net proceeds realized" means the sums of money actually received by Travelers from Briscoe under the program.

As adverted to earlier, whenever the parties to this agreement intended for there to be an interest component they expressly provided for it. Whenever the parties to this agreement did not intend for there to be an interest component the agreement is silent as to interest. Thus, the omission of any reference to interest in Section 9 reveals the parties' intent that there be no interest component in Briscoe's entitlement.

Further, the remainder of Section 9 discusses various deductions that must be made in order to determine the Net Proceeds Realized. These deductions include all funds advanced by Travelers to aid Briscoe in the disposition of the collateral, all funds ad-

---

**8.** This well-known rule of contract interpretation means:

"The expression of one thing is the exclusion of the other." *Reading v. Travelers Ins. Co.*, 24 F.Supp. 394, 396 (M.D.Pa.1938), *aff'd*, 104 F.2d 257 (3d Cir.), *cert. denied*, 308 U.S. 588, 60 S.Ct. 114, 84 L.Ed. 493 (1939).

**9.** Briscoe relies on the definition of realize in *Black's Law Dictionary, Rev. 6th ed.*, (1990): "REALIZE. To convert any kind of property into money; but especially to receive the returns from an investment." This definition is inapplicable in the context of the ADC. Under the ADC, property is not being converted into money. Rather, money itself is deposited under the ADC.

vanced by Travelers to aid Briscoe in completing its contracts, all funds advanced to third-parties to dispose of the collateral, and any other advances made by Travelers to Briscoe—except internal costs incurred by Travelers. If Travelers had an obligation to invest the collateral prudently on behalf of Briscoe, there would be a provision for Travelers to deduct the expenses associated with investing the money. The absence of such a provision further indicates the parties' intent that there be no interest component in the calculation of Briscoe's entitlement.[10]

Moreover, paragraph 9.3(d) speaks of Travelers' obligation to "review or monitor FBC's performance hereunder." [11] This language repudiates Briscoe's argument that Travelers was acting as a fiduciary. A fiduciary does not have an obligation to monitor the performance of its principal. On the contrary, it is the principal that monitors the performance of the fiduciary or the agent. The language of paragraph 9.3(d) is in harmony with the Court's conclusion that Travelers hired Briscoe as its agent to assist in the disposition of the collateral. Travelers, as the principal, has the power under Paragraph 9.3(d) to monitor the performance of its agent, Briscoe.

This conclusion is further borne out by Paragraph 9.2 of the ADC which states: "FBC will nevertheless receive the sum of $3 million (hereinafter the 'Minimum Guarantee')." By referring to Briscoe's payment as a "Minimum Guarantee" the ADC indicates that Briscoe is receiving a fee for services performed. If the relationship of the parties were akin to partners, the ADC would not refer to Briscoe's payment as a "Minimum Guarantee." Equal partners usually do not provide minimum guarantees to one another.

Rather, partners usually share equally in the risk and reward of the venture.

Finally, Paragraph 9.4 is dispositive of the matter pending before the Court. Paragraph 9.4 states that after 18 months, if Briscoe is not in default under the ADC, Travelers will estimate the amount to be paid to Briscoe at the end of the Program. Travelers will subtract from this amount certain reserves. The balance, if any, will then be immediately paid to Briscoe or, if held by Travelers, Travelers will accrue interest at a rate of 15% per annum. Indeed, Travelers only accrues interest on behalf of Briscoe after 18 months and after the deduction of reserves. Any other requirement would contradict Paragraph 9.4.

It bears repeating that under the ADC, when the parties intended for there to be an interest requirement, they expressly provided for it, as in Paragraph 9.4. When the parties did not intend for there to be an interest requirement, the issue of interest was not mentioned. Hence, the absence of an explicit direction to add interest or earnings to Briscoe's entitlement is not an oversight. The parties' silence on the requirement that Travelers accrue interest on the proceeds deposited under the ADC must be construed as deliberate. The absence of such terms in the ADC mandates the conclusion that such terms were not agreed to by the parties.

### 8. Section 10

Briscoe seeks refuge in Section 10 of the ADC, which discusses Non–Program Loans by Travelers to Briscoe. These are loans needed by Briscoe for purposes other than

---

**10.** Paragraph 19.5 of the ADC provides that Travelers agrees to provide Briscoe with all relevant information regarding:
   (a) the collection and/or disposition of assets other than by FBC.
   (b) the costs, expenses and advances incurred or paid by Travelers and chargeable to the preservation, collection and/or disposition of the Collateral.
   (c) a copy of the estimate of calculation as provided in paragraph 9.4 or any adjustment thereof.
Conspicuously missing from this paragraph is any requirement that Travelers supply Briscoe

with information regarding investment or earnings on the Collateral. Again, the absence of such a provision further indicates the parties' intent that there be no interest component in the calculation of Briscoe's entitlement.

**11.** This language is repeated in Paragraph 19.2 which states: "FBC shall permit agents or representatives of Travelers to monitor its performance under this Agreement and, during reasonable business hours, to inspect its books and records."

disposition of the collateral. ADC Paragraph 10.4 grants to Travelers:

> ... a further security interest in any amounts which FBC may become entitled to receive as provided in Paragraph 9 and property of FBC which may be in the possession or control of Travelers, any accounts receivable, contract rights, equipment, inventory, general intangibles, chattel paper, instruments, whether presently owned or hereafter acquired, and all proceeds thereof together with all accessories, substitutions, additions, replacements accessions and increments thereto.

Briscoe argues in its brief that the words "accessories, substitutions, additions, replacements accessions and increments thereto" implies that the parties intended for the collateral to grow with interest. Briscoe then argues that Travelers merely had a security interest in that growth rather than unqualified ownership. (Briscoe Opp.Br. at 24). Such a compressed interpretation of the contract is conceptually creative, but legally bereft. If the parties intended for the collateral to grow with interest and for Briscoe to be the owner of the interest the ADC would have said so with language of greater clarity. Paragraph 10.4 represents standard language reaffirming that Travelers, as a secured creditor, has a security interest in all of Briscoe's assets, both those presently owned and those to be acquired in the future. The language referring to "accessories, substitutions, additions, replacements accessions and increments thereto" is commonplace legal jargon that vests Travelers with a security interest in Briscoe's property even if the property is in some fashion altered. Thus, if Briscoe owned a desk that was later replaced with a bookcase, Travelers would own a security interest in both the desk and the bookcase. However, once the bookcase is sold and the cash proceeds are deposited with Travelers under the ADC, Travelers becomes the sole owner of the cash. This is the essence of the collateral disposition under the ADC.

### 9. Section 12 of the ADC

Section 12 of the ADC discusses the application of the net proceeds to the indebtedness. Paragraph 12.1 requires Travelers to apply the proceeds first against interest and then to principal. Critically, the agreement refers to the "Net Proceeds Percentage Amount, *if any*, which FBC may have become entitled to receive as provided in Paragraph 9.1...." (Emphasis added). Hence, from the standpoint of the parties at the time the ADC was drafted it was unclear whether Briscoe would recoup any money in excess of the amounts loaned by Travelers under the ADC. Certainly, if the parties intended for Briscoe to share in the interest or investments on the money deposited under the ADC, a more affirmative portrayal of Briscoe's position would have been set forth in the agreement. The "if any" language of paragraph 12.1 comports with the Court's interpretation of the ADC. It suggests again that the parties did not intend for Briscoe to share in the interest or investments on the money deposited under the ADC.

The Court finds further support for its interpretation of the ADC in Paragraph 12.5 of the ADC which states, in relevant part:

> Pending the collection and/or disposition of all of the Collateral, Travelers shall have the absolute and unlimited right to possess and utilize *as its own* all of the proceeds, including cash proceeds, received from the collection and/or disposition of the Collateral, having no obligation to segregate or identify the proceeds and *with FBC having no rights thereto;*

(Emphasis added). Repeatedly, the ADC expressly states that Briscoe has absolutely no right to the money once it is deposited with Travelers. The phrases "as its own" and "no rights thereto" inescapably compel the *idee fixe* that Briscoe has no right to any interest earned on the money.

Moreover, Paragraph 12.5 is similarly in accord with the Court's interpretation of the ADC and antithetical to the Briscoe discernment of the ADC. It expressly states that once the money is deposited with Travelers, Travelers has the right to do whatever it wants with the money. Travelers could invest the money or not invest the money. Travelers could use the money for its own corporate purposes. The language of Paragraph 12.5 is utterly inconsistent with Trav-

elers having a fiduciary obligation to invest the money deposited under the ADC on behalf of Briscoe.

Pointedly, the words "utilize as its own" indicate that if Travelers chose to invest the money, it would be investing the money on its own behalf—not on behalf of Briscoe. Thus, Travelers would be entitled to keep all interest earned on the money.

### 10. Section 25 of the ADC

Finally, Paragraph 25 puts an end to any debate over whether or not Travelers is a fiduciary merely holding the money on behalf of Briscoe. Paragraph 25 says: "Nothing contained herein shall be deemed to or construed to create a relationship between the parties except as otherwise exists between the parties, namely, as principal and surety on any payment, performance or fidelity bond and debtor and secured creditor on any indebtedness." Perhaps the draftsmen of the ADC in 1982 were clairvoyant as to the arguments to be advanced by Briscoe in 1995. They certainly made it indisputable that Travelers is not a fiduciary under the ADC. Travelers expressly remains solely a secured creditor.

### 11. Conclusion

The language of the ADC persuades the Court that Travelers is not a fiduciary holding the money on behalf of Briscoe. The language of the ADC also demonstrates that Travelers has no duty to accrue interest on the collateral for the benefit of Briscoe. Rather, the language of the ADC informs that Travelers owns the money deposited under the ADC as a secured creditor. Any interest earned on the money after it was deposited is the sole and exclusive property of Travelers.

### E. The Uniform Commercial Code

■ Before leaving its discussion of the language of the ADC, the Court must consider whether any provisions of the Uniform Commercial Code ("UCC") alter the Court's interpretation. The parties agree that, in the absence of a contrary writing, the UCC governs this transaction. In fact, Mr. Larner testified that when drafting the ADC he relied on the UCC. (Trial Tr. II at 79; Larner Dep. 455–456). Specifically, Briscoe claims that the ADC is governed by Article 9 of the UCC [12] which provides:

**12A:9–207. Rights and Duties When Collateral Is in Secured Party's Possession**

(1) A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.

(2) Unless otherwise agreed, when collateral is in the secured party's possession

(a) reasonable expenses (including the cost of any insurance and payment of taxes or other charges) incurred in the custody, preservation, use or operation of the collateral are chargeable to the debtor and are secured by the collateral;

(b) the risk of accidental loss or damage is on the debtor to the extent of any deficiency in any effective insurance coverage;

(c) the secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation;

(d) the secured party must keep the collateral identifiable but fungible collateral may be commingled;

(e) the secured party may repledge the collateral upon terms which do not impair the debtor's right to redeem it.

(3) A secured party is liable for any loss caused by his failure to meet any obligation imposed by the preceding subsection but does not lose his security interest.

(4) A secured party may use or operate the collateral for the purpose of preserving the collateral or its value or pursuant to the order of a court of appropriate jurisdiction or, except in the case of consumer goods, in the manner and to the extent provided in the security agreement.

**12.** New Jersey has codified this UCC provision at N.J.S.A. 12A:9–207.

Briscoe argues that under UCC § 9–207 the debtor is entitled to the benefit of any interest earned on the proceeds deposited under the ADC. Briscoe's argument ignores two critical facts. First, UCC § 9–207, subsection 2, states at the outset that the parties are free to contract around the UCC. Subsection 2 states: "Unless otherwise agreed...." Arguably in entering into the ADC, Briscoe and Travelers sought to contract around the requirements of UCC § 9–207. Second, Briscoe's argument overlooks the fact that money deposited under the ADC was not collateral being used to secure a loan. At the time the parties entered into the ADC, Briscoe had already defaulted on its loans from Travelers. The moneys deposited under the ADC were funds from the liquidation of collateral after Briscoe's default. Nothing in UCC § 9–207 suggests that it should govern the contractual relationship of the parties after the debtor has defaulted. Therefore, the Court finds that UCC § 9–207 does not govern the ADC and does not alter this Court's interpretation of the language of the ADC.

However, the Court's task remains incomplete. Third Circuit precedent teaches that to determine whether or not the ADC is ambiguous, the Court must examine the conduct of the parties leading up to the signing of the ADC and the conduct of the parties after the execution of the ADC. The Court will examine each in turn.

### F. Pre-execution Conduct

The first written evidence of the parties' negotiations can be found in a draft letter from Briscoe to Travelers dated November 5, 1981, outlining the parties' agreement. (Exh. 65). Interestingly, this early letter indicates that Briscoe would receive 30% of the net proceeds—not 50% as established in the ADC. More importantly, this draft letter, written by Briscoe, indicates that Briscoe will perform services for Travelers for a fee. The letter states: "Travelers will retain the services of FBC as its manager to complete work in progress on assigned contracts, to collect receivables and retainages on these

contracts and to pursue all claims now outstanding on Travelers behalf.... FBC will be compensated on a cost plus 30% of net recoveries basis." Thus, as early as November 1981 the parties contemplated that Travelers would hire Briscoe as its agent.

It is also worth noting that this early draft by Briscoe does not provide for the receipt of interest by Briscoe on either gross or net proceeds. Under the agreement outlined, Briscoe was to receive 30% of the net recovery and no more. "Net recovery" was defined *by Briscoe* as "the amount of cash obtained through the collection process net of all costs of recovery...." Nowhere in the definition of net recovery did Briscoe reference that interest would be included.

Lastly, in Paragraph 4, Briscoe proposed: "All net recoveries will be deposited in a segregated fund and held by FBC in trust for Travelers until such time as these funds are used to redeem shares." However, Travelers later rejected the concept of Briscoe holding the funds for Travelers. (Larner Aff. ¶ 11).

The testimony of all of the witnesses at trial was that Calafati and Loeffler reached a "handshake deal" sometime in December 1981, during a meeting at a hotel in New Jersey. This testimony is confirmed by a mailgram from Louis R. Pepe, Esq., Briscoe's attorney, to Travelers' attorney Larner dated December 23, 1981: "our respective clients have reached substantial agreement on all the terms of a work out." (Exh. 66). Pepe suggested that he and Larner begin meeting to draft a letter agreement or memorandum of understanding.[13] In fact, Larner, Pepe, and Richard D. Jones, Esq., another Briscoe attorney, met on January 6, 1982, and January 7, 1982, to begin drafting a letter of intent. (Larner Aff. ¶ 16).

The drafting of a letter of intent turned out to be a very formidable task. As will be seen, the parties exchanged numerous drafts and held numerous meetings in an effort to draft an instrument that reflected the handshake agreement reached between Calafati and Loeffler.

---

**13.** In addition, handwritten notes dated December 17, 1981, by James Peters memorialize a

telephone conversation with Loeffler indicating the parties had reached agreement. (Exh. 15).

The first draft letter of intent was proposed by Briscoe and is dated January 7, 1982. (Exh. 67). This letter of intent states: "The escrow agreement shall contain such other terms regarding interest and investment policy *as shall subsequently be determined* by the parties as provided in paragraph 12 hereof." (emphasis added). Thus, the parties had not reached any agreement regarding interest and investment policy during their handshake deal.[14]

Briscoe's attorney, Jones, proposed changes to his draft letter of intent by sending a facsimile to Travelers' attorney, Larner, on January 11, 1982. (Exh. 68). In this facsimile Briscoe proposed several modifications to the draft letter of intent:

1. FBC would be controlled by Calafati, Bill and Chris Kelly;

2. Briscoe would receive a $3 million guarantee;

3. There would be no interest on program advances to FBC.

Jones also sent a facsimile to Kelly on January 15, 1982, enclosing a draft letter of intent written by Briscoe. (Exh. 69). In this draft, Briscoe modified its idea for an escrow account. Instead of proposing that Briscoe hold all of the funds on behalf of Travelers, Briscoe now proposed that all money be deposited with an escrow agent and reserve amounts be withdrawn "regularly" and paid to Briscoe. Most importantly, Briscoe's draft expressly states: "The escrow agreement shall provide that interest earned on the escrow account shall be the property of and be paid to FBC and that the escrow agent shall ministerially execute investment direction provided by FBC." Again, this proposal was unacceptable to Travelers, which believed that Briscoe did not earn the right to receive any money until the program was completed. (Larner Aff. ¶ 20).

Larner met with Loeffler to discuss Briscoe's proposed changes. Afterward, Larner drafted another letter of intent, dated January 19, 1982. (Exh. 70). In this draft, Travelers clearly rejects any suggestion that Briscoe owns the money, holds the money or that the money be placed in an escrow account. The draft states: "FBC shall transfer, assign and set over to Travelers all of the assets securing the indebtedness," except One Summit Square.[15] Thus, Travelers did not want Briscoe to hold the money and did not want an escrow agent to hold the money. Rather, Travelers wanted Briscoe to "set over to Travelers" the money collected under the ADC. Such language indicates that Travelers believed as a secured creditor it was the owner of the proceeds of the liquidation of the collateral.

The draft goes on to state: "Upon transfer of these assets, Travelers will credit to the repayment of the Indebtedness, first against interest and then principal, an amount equal to the market value of the assets transferred...." By referring to the value of the assets transferred, Travelers establishes that it will not credit Briscoe with any interest earned on the assets transferred. Rather Travelers was only going to credit Briscoe with the net value of the assets transferred.

This draft also clearly indicates that the parties agreed that Travelers would hire Briscoe as its agent for a fee. The draft states: "In order to maximize realization to Travelers upon collection and/or disposition of the assets transferred to Travelers, Travelers will agree to utilize FBC's services for the collection or disposition of the assets for which services Travelers will agree, upon completion of performance of the services, to pay to FBC 50% of the net proceeds received by Travelers from the collection and/or disposition of said assets."

This draft also has the beginnings of a formula for Travelers to estimate the amount of money due to Briscoe and to make periodic payments to Briscoe. The draft states:

---

14. This first letter clearly contradicts the trial testimony of Loeffler and Calafati, who each testified that the handshake agreement included an agreement that Briscoe would receive the proceeds of any interest or earnings on the money. (Trial Tr. 38; 165–66).

15. One Summit Square was a claim being pursued against Briscoe in Indiana. Travelers feared that Briscoe would be found liable to the owner of the project. Therefore, Travelers excluded the One Summit Square litigation from the ADC.

Travelers will agree that, from time to time during the period of performance of services by FBC, to make deposits into an escrow account of sums determined in accordance with a formula, which formula will be designed, based upon the net proceeds received by Travelers to date, to project the amount which will be payable by Travelers to FBC assuming completion of performance and in excess of the minimum guarantee. Any sums deposited in the escrow account will be invested, the interest earned thereon being payable with the distribution of the escrow account to FBC and/or Travelers, as the case may be. . . .

The discussion of interest is telling. To Travelers' way of thinking, Briscoe was only entitled to interest on that portion of its fee which should have been, but was not, advanced by Travelers to Briscoe. This is borne out by the ADC, which requires Travelers to pay 15% per annum interest on the estimated net proceeds due to Briscoe, if Travelers fails to pay Briscoe this amount. (Paragraph 9.4 of the ADC). Again, this letter suggests that the parties considered the issue of interest and when they intended for Briscoe to recoup interest they provided for it in express language.

The next piece of extrinsic evidence proffered by the parties are handwritten notes by Loeffler dated February 2, 1982, which summarize the key terms of the ADC as follows: "Essentially: (1) liquidation, (2) transfer of all assets to TIC [16] now!, (3) FBC provides services for bringing in cash for TIC, (4) mutual releases, (5) minimum compensation $3.0 payable as 'earned,' (6) 50% of net proceeds to. FBC. FBC to use its share to pay for IRS, estate, One Summit, minority stockholder, Chase Bank." (Exh. 16). Loeffler apparently understood that Briscoe would transfer its assets to Travelers immediately. In addition, Loeffler apparently understood that Travelers would hire Briscoe as its agent for a fee. Nothing in Loeffler's

notes indicates that Briscoe would receive interest on the money transferred to Travelers.

By the middle of February it was becoming obvious that the parties would not be able to reach agreement on the language of a letter of intent. As a result, Travelers delivered to Briscoe a letter dated February 11, 1982, executed by Loeffler, which did not require Briscoe's signature, "set[ting] forth in writing Travelers' position with regard to the continuing discussions concerning repayment of the Indebtedness of FBC to Travelers." (Exh. 71).[17] This letter is the most comprehensive discussion of the parties' agreement.

First, the letter reconfirms that Travelers will hire Briscoe as its agent for a fee. The letter states: "FBC and Travelers have discussed repayment of the Indebtedness through collection and/or disposition of the assets securing the Indebtedness and the *utilization of FBC's services* through FBC's current management as the most ·commercially reasonable method of effecting maximum realization from the collection and/or disposition of the assets." (Emphasis added). The letter also states: "Travelers would utilize the services of FBC, among others, to collect and/or dispose of the assets." That Briscoe was to receive a fee for its services is further evidenced by the paragraph of the letter that states: "Upon completion of performance of its services, FBC would receive 50% of net proceeds realized from the collection and/or disposition of the assets. . . ." The letter also guarantees Briscoe a $3 million payment up front for its services.

Second, the letter made it clear that once Briscoe liquidated collateral and paid the money to Travelers, Travelers would be the owner of the money. The letter states: "FBC would assemble and turn over to the extent required by Travelers substantially all of the assets securing the Indebtedness to Travelers" except for One Summit Square.

16. "TIC" is an abbreviation for The Travelers Indemnity Company.

17. Briscoe also introduced a nearly identical copy of this letter of intent. (Exh. 18). The only material differences between the copy of the let-

ter introduced by Briscoe and the copy of the letter introduced by Travelers are the dates. The Travelers' letter is dated February 11, 1982. The Briscoe letter is dated February 17, 1982. Both letters are signed by Mr. Loeffler.

Thus, Travelers unequivocally rejected the idea of an escrow account and rejected the idea of Briscoe holding the assets for Travelers.[18]

Finally, this letter makes it clear that the amount of money to be paid to Briscoe is exclusive of interest or earnings. The letter defines "Net Proceeds" as "the net amount realized from the collection and/or disposition of the assets less the sum of the advances made by Travelers to FBC. . . ." The definition does not include interest or earnings. The only reference to interest appears in the section that states that after eighteen months Travelers will estimate the amount to be paid to Briscoe, and will "accrue interest thereon and/or advance to FBC, in whole or in part, such estimated amount."

In sum, the five-page, detailed proposal by Travelers makes it clear that Briscoe would turn over its assets to Travelers, Travelers would own this money, and Travelers would utilize the services of Briscoe for a fee. Travelers' letter does not require Travelers to accrue interest on behalf of Briscoe. Such a provision was patently *not* agreed to by Travelers. Most importantly, much of the language of this letter appears in the final ADC.

Having failed to reach agreement on a letter of intent, in March of 1982 the parties turned their attention to drafting the ADC. The first draft of the ADC was prepared by Briscoe on March 8, 1982. (Exh. 73). In its draft ADC, Briscoe proposes conveying and delivering to Travelers "possessory rights" in its assets. Briscoe does not recite the fact that it is in default under the Loan and Security Agreement, but claims the parties simply agreed to work together. Briscoe proposes depositing funds under the ADC into a Program Account. Interestingly, in this draft of the ADC Briscoe, for the very first time, seeks the right to interest on net proceeds. Briscoe defined "Net Proceeds" as "the sum of (i) Program Revenues, (ii) $1,800,000 heretofore repaid to Travelers by FBC, (iii) *income earned* by the Program Account—less program Costs. . . ." (Emphasis added). In addition, Briscoe also proposed: "The Program Account shall be credited with all Program Revenues delivered to Travelers and debited for all Program costs. The *balance* of the Program Account shall earn and be credited with interest, all such interest being added to Program Account principal." (Emphasis added). The import of this draft is that it speaks of interest being earned on the balance of the program account—that is, net proceeds. There is nothing in this draft of the ADC or subsequent drafts of the ADC that supports Briscoe's current argument that it is entitled to interest on gross proceeds. This exhibit is a telling piece of evidence that undermines the credibility of Briscoe's presentation.

Travelers responded by drafting its own version of the ADC dated March 30, 1982. (Exh. 74).[19] Travelers' draft of the ADC makes numerous changes and rejects many of the proposals suggested by Briscoe. First, Travelers made it clear in the preamble that Briscoe is in default under the Loan and Security Agreement. Second, Travelers substituted the "commercially reasonable" standard for the concept of maximization of

---

**18.** During the trial, Briscoe advanced the theory that an escrow account was not established because Travelers feared establishing an account that would create a fund that could be targeted by third parties. Briscoe could find some solace in the affidavit of Larner in which he states he eliminated the escrow account "because, *inter alia*, Briscoe at the time was the defendant in a significant litigation concerning a project it had constructed in Fort Wayne, Indiana. If Briscoe were to be held liable in the matter, the Fort Wayne plaintiff ('One Summit Square') could potentially seek recovery from the escrow account, thereby jeopardizing Travelers' full or partial interest in the portion of the liquidation proceeds held therein." In addition, Briscoe could find some support in a May 2, 1980 letter from

George L. Blick, Assistant Vice President, Claims, Aetna, to James M. Peters, Jr., Assistant Secretary, which discusses Travelers' possible fear of liability to third-parties. (Exh. 12). However, the Court finds, in light of the totality of the circumstances, that Travelers' alleged fear of third-party claimants was not a driving force behind the formation or drafting of the ADC. Certainly, Briscoe's theory is not a sufficient basis for implying terms that do not appear in an unambiguous contract.

**19.** Exhibit 74 is a cover letter that was sent to Briscoe enclosing the draft ADC by Travelers. The actual draft of the ADC is Exh. J to the Larner Affidavit (and Exhibit 22).

the liquidation proceeds put forth by Briscoe. Third, Travelers specified that costs of liquidation of assets were to be repaid to Travelers from the proceeds. Fourth, Travelers included a provision for paying Briscoe an estimated amount after eighteen months or accruing interest on such amount. Fifth, Travelers specified that Program advances would be interest-free and that Non–Program Loans would be with interest. Sixth, Travelers expressly characterized the relationship of the parties as principal and surety and debtor and secured creditor. Notably, each of these changes appears in the final ADC.

Travelers manifestly rejected Briscoe's proposal for depositing the money in an escrow account or a Program Account that would earn interest for the benefit of Briscoe. There is simply no counterpart to this proposal in the Travelers draft of the ADC. Likewise, there is no provision for investment of *any* proceeds from the liquidation of assets and there is no provision for crediting Briscoe with interest or earnings on proceeds.

At this stage of the negotiations it became clear to Briscoe that it was not going to get everything it wanted in the ADC. Rather than risk the possibility that negotiations would break down altogether, Briscoe threw in the towel on several important issues. This is reflected in a letter from Briscoe's attorney, Pepe, to Travelers' attorney, Larner, dated April 5, 1982, in response to the Travelers draft of the ADC. (Exh. 75). In his letter, Pepe indicates there are "minor changes" which can be negotiated. He also states:

> There are other terms and conditions which cause us no small concern, but which, we are certain, were quite intentionally included in the draft and were not the result of oversight or drafting error. These provisions fall generally into the category of overprotection for Travelers at the expense of Briscoe's interests. Nonetheless, in the interest of finally resolving this matter, we have decided to suppress our disappointment, forego any further ne-

> gotiations on these points, assume good faith performance by Travelers, and do our best to make this undertaking successful, notwithstanding the unfortunate inclusion of these terms.

In addition, Pepe states there are certain terms of the draft "which cannot be accepted by Briscoe simply because they make the arrangement unfeasible." These items were disputes regarding: (1) double taxation for Briscoe; (2) the absence of any plan for a debt for equity swap; (3) a dispute over proceeds of Fort Wayne litigation; (4) Briscoe's waiver of *any* claims against Travelers; and (5) the proposed execution date. Nowhere did Pepe complain of Travelers' failure to credit Briscoe with interest on net or gross proceeds. Thus, *it is a fair inference that Briscoe surrendered fighting for this point.* This conclusion is further borne out by Pepe's conclusion: "[T]here were many more issues which troubled us, and, in some cases, caused us grave concern. We have, however, distilled that concern to the five foregoing items in an attempt to focus the attention of both parties on only those issues, the resolution of which is essential if we are to proceed."

This letter is persuasive evidence that while Briscoe may have initially sought an agreement that provided for Travelers to accrue interest on its behalf, it relinquished this desire during negotiations. By definition, each side to a negotiation must make compromises along the road to an agreement. In Briscoe's wisdom, it was better to forego interest on net proceeds rather than risk the alternative that no deal would be reached with Travelers.[20]

At this stage in the negotiations the parties began to focus on the five points outlined in Pepe's April 3, 1982 letter. Briscoe expressed concern that it would face double taxation. Briscoe believed that it would have to pay taxes on money it received from the liquidation of collateral and again pay taxes when it received its payment of 50% of the net proceeds under the ADC. Jones explained this concern in a letter to Larner dated April 8, 1982. (Exh. 76). Jones' letter

---

**20.** This letter directly contradicts the trial testimony of Calafati, who said that he would never have agreed to the ADC without a provision for accruing of interest. (See *infra* Section H.2).

states: "Regardless of what labels are put on transfer payments, if all proceeds of the Program become the property of Travelers before FBC's share is made available to it, the distribution of FBC's share will fall within the definition of income under Section 61 of the Internal Revenue Code."[21] Even Jones recognized that Travelers would own the proceeds deposited under the ADC, which would create a double taxation problem for Briscoe.

On April 14, 1982, Pepe wrote a letter to Larner outlining eight technical revisions to the draft ADC. (Exh. 77). In Travelers' draft of the ADC, it provided that Travelers would attempt to estimate the amount due to Briscoe and either pay that amount to Briscoe or accrue interest on that amount. Pepe suggested that interest should accrue on that amount *before* Travelers deducted reserves:

> 3) In Paragraph 9.4(a), ... interest should be accrued on the entire Net Proceeds Percentage Amount, without regard to reserves, but adjusted if necessary before payment.

Briscoe objected to the interest calculation on the Estimated Net Proceeds, but *did not* object to the failure of Travelers to accrue interest on collateral. However, Briscoe was unable to extract even this minor modification from Travelers. The final ADC in Paragraph 9.4 provides interest is calculated on the Net Proceeds Percentage Amount *after* a $2 million reserve and an additional reserve are subtracted.

On April 23, 1982, Pepe sent another letter to Larner with further proposed revisions to the ADC. (Ex. 20; Larner Aff.Exh. N). Briscoe specifically sought to clarify that it was the owner of the proceeds from the collection and/or disposition of the collateral. Briscoe, again, was primarily concerned that absent such language it would face double taxation. As a result Briscoe sought the following modifications to the ADC:

> Paragraph 9 is retitled, "Release of Net Proceeds Percentage Amount"

Paragraph 9.1 is amended to include "... fifty (50%) percent of the net proceeds of the collection/disposition of the collateral shall be released by Travelers and returned to FBC.... Travelers has the unlimited right to commingle FBC's property with its own...."

Paragraph 9.2 is amended to include "... Travelers shall nevertheless release the sum of $3 million (hereinafter the "Minimum Guarantee") and return said sum to FBC."

Paragraph 12.1 is amended to include "... less the Net Proceeds Percentage Amount, if any, released by Travelers and returned to FBC ... or so much of the Minimum Guarantee as Travelers shall have released and returned to FBC...."

The final ADC indicates that each of these revisions was rejected by Travelers. None of this language appears in the final ADC. Travelers steadfastly maintained throughout the negotiations that it was the owner of the proceeds from the disposition of the collateral and this unremitting position is reflected in the final ADC.

As discussed earlier, Travelers' ownership of the proceeds from the disposition of the collateral is most clearly expressed in Paragraph 12.5 of the ADC. The language of this paragraph was drafted by Larner in a letter to Jones dated April 29, 1982. (Exh. 21 and Exh. 78). Larner's draft of ¶ 12.5 expressly states: "Travelers shall have the absolute and unlimited right to possess and utilize as its own all of the proceeds, including cash proceeds, received from the collection and/or disposition of the Collateral, having no obligation to segregate or identify the proceeds and with FBC having no rights thereto...." This is the exact language of Paragraph 12.5 that appears in the final ADC.

In his letter, Larner also indicates that Briscoe's proposed revisions to the ADC are unacceptable to Travelers. However, to ac-

---

**21.** Handwritten notes by Peters dated April 22, 1982 also reveal Briscoe's fear of double taxation. (Exh. 19). Briscoe may seek solace in the fact that these handwritten notes state: "TIC [Travelers] act as fiduciary. Not have incidents of ownership." However, when the document is read in its entirety, it is clear that these notes simply reflect what Briscoe wanted in the ADC and not what was agreed to by Travelers. The subheading preceding these notes states: "FBC proposed." Later in his notes Peters lists "TIC position." Therefore, the Court rejects Briscoe's contention that these notes reflect a consensus position.

commodate Briscoe's fear of double taxation, Travelers suggested language that provides Briscoe's fee would be deemed to be paid directly out of the liquidation proceeds. This language also appears in the final ADC.

Negotiations between Briscoe and Travelers continued throughout the summer of 1982. Additional proposals and drafts of the ADC were exchanged. There were, however, no proposed changes relevant to the issues before the Court.

On July 27, 1982, Travelers made a written demand upon Briscoe for payment of all indebtedness under the Loan and Security Agreement. (Exh. 24). No explanation was proffered by the parties as to why Travelers made its demand for payment at such a late date.

In summary, the ADC negotiation history, evidenced by the proposals and counter-proposals of the parties, demonstrates that to the extent Briscoe tried to introduce an interest component into the parties' agreement (other than as reflected in ADC Paragraph 9.4), such efforts were flatly rejected by Travelers.

The ADC was executed on August 2, 1982. The Execution Memorandum was contemporaneously signed. As here relevant, the Execution Memorandum contains: (a) Briscoe's further acknowledgment of its default under the Loan and Security Agreement (¶ 1) and (b) the designation of a single bank account to be the recipient of liquidation proceeds and the source of "Program" advances (¶ 7).

**G. Post–Execution Conduct**

The most significant conduct by the parties after the execution of the ADC was Travelers' regular habit of transferring money out of the bank account established under the ADC program into other Travelers' bank accounts. In moving the money around to suit its own corporate purposes, Travelers did not act like a fiduciary holding money on behalf of Briscoe. (Exh. 59). Rather, Travelers acted like it was the sole owner of the money.

In 1989 Travelers hired a consulting firm, Mortenson & Associates ("Mortenson"), to assist Travelers in calculating the estimated amount payable to Briscoe under the ADC. (Exh. 44). Mortenson issued a report estimating Briscoe's entitlement under the ADC for the period of August 2, 1982 through January 1984 and then through June 1989. This report indicates that Briscoe was entitled to $4,479,504 as of June 30, 1989. In estimating Briscoe's entitlement, Mortenson did not include interest on either gross or net proceeds. More importantly, in calculating Briscoe's entitlement Mortenson failed to deduct the $2 million reserve and the additional reserve, as required by the ADC. (Peters Deposition at 366; Exh. 45). In a letter to Calafati dated November 28, 1989, Travelers' secretary James Peters explains that the Mortenson figures are *not* accurate because they fail to subtract either the $2 million reserve or the "additional reserve" specified in the ADC. Peters suggests an additional reserve of $5,771,786. As a result, under the Mortenson calculations after the deduction of reserves, Briscoe was not entitled to any payment as of June 30, 1989.

On December 5, 1989, William F. Kelly wrote an internal memorandum to Calafati in which he proposed ways of interpreting the ADC that would allow Briscoe to earn more money under the ADC. (Exh. 79). Kelly wrote: "[T]he sums actually received by The Travelers *should* include the interest The Travelers has received while the funds have been in its possession." (Emphasis added). By using the word "should" Kelly concedes that the language of the ADC does not provide for interest to accrue on behalf of Briscoe, but, in his opinion, the ADC "should" include interest on behalf of Briscoe. His memo goes on to state "it is reasonable to believe" and "it seems logical" that Briscoe should receive interest. Moreover, he suggests that there are "areas of ambiguity" in the ADC which Briscoe can use to its advantage. The Court observes that Briscoe's deafening silence as to its entitlement to interest between 1982 and 1989 bodes ill for its current assertion of entitlement to interest on the ADC's gross proceeds. This memo is clearly an after-the-fact attempt by Briscoe to earn more money under the ADC.

One reason Briscoe may have been motivated to reexamine the ADC in December

1989 is that no one expected the program to last as long as it had. In his memorandum, Kelly states: "The program was expected to last three years and I believe no one at the time in 1982 thought that it would take over seven (7) years for a successful completion." In fact, at the time this Opinion was written more than 13 years had passed and all the parties agreed that the program was still not yet complete. That the parties expected the program to last only three years is evidenced in Paragraph 10.3 of ADC which states non-Program Loans are due 36 months from the Effective Date of the ADC. This three-year term is further evidenced in Schedule F to the ADC called a Cost Budget, which extends three years.

On January 24, 1990, Briscoe prepared a document entitled "Calculations of Entitlement." (Exh. 80). In this document, Briscoe calculates the amount it expects to get paid pursuant to the ADC under several "scenarios." One of the proposed "scenarios" provided that Briscoe was entitled to receive interest on *net* proceeds. Revealingly, none of the "scenarios" calculated interest on gross proceeds—the theory now being advanced by Briscoe at trial.

In the Spring of 1991, Pepe wrote several letters to Larner seeking Travelers' estimate of Briscoe's entitlement under the ADC. (Exh. 47; Exh. 48; Exh. 49).[22] Larner finally responded in a letter dated July 30, 1991. (Exh. 50). In this letter, Larner quibbles over whether certain expenses submitted by Briscoe should be treated as interest-free Program Advances or as interest-bearing Non–Program Loans. Larner also states that Travelers' estimate of Briscoe's entitlement under the ADC, if any, is coming shortly. However, Travelers never provided Briscoe with an estimate of its entitlement.

The dispute over whether certain expenses should be categorized as interest-free Program Advances or interest-bearing Non–Program Loans continued between Travelers and Briscoe. In a letter dated August 5, 1992, from Paul D. Tubach of Travelers to Calafati, Travelers' growing frustration with Briscoe is evident. (Exh. 57). At this point in time Travelers believed that completion of

the ADC program was taking far too long and was costing far too much money. Tubach wrote that since the remaining collection of collateral was more legal in nature, less was required from Briscoe; therefore, expense reductions were "both necessary and proper." As a result, Tubach ordered several financial cutbacks:

1. Travelers will not fund appeal of Morrison–Knudsen and URS litigation in Las Vegas;

2. Travelers will not fund the West Penn Testing Labs claim or the GAI Consultants claim in Pittsburgh;

3. Only 50% of Briscoe's payroll would be considered a Program Advance;

4. Car expenses are not a Program Advance;

5. A.H. Meyer's employment is not a Program Advance;

6. Travelers will take over the Las Vegas litigation under Paragraph 3.2(c) of the ADC;

7. If Pittsburgh is not settled by December 31, 1992, Travelers may terminate the ADC pursuant to ¶ 3.2(c).

As a result of the financial cutbacks, Briscoe was forced to apply to this Court in 1994 for a preliminary injunction forcing Travelers to advance more money. In his affidavit in opposition to the Briscoe application for preliminary injunction, Tubach summarized the gradual but steady decreased funding by Travelers:

(a) Briscoe had sixty-two home office employees in 1982; nineteen in 1991; and three in 1994;

(b) Aggregate annual Program Advances were $5,554,428 in 1984; $2,579,995 in 1991; and $1,068,376 in 1993;

(c) Travelers ended Non–Program Loans for such luxuries as sky-box seats, Briscoe's annual dinner dance, gun club membership, new cars, non-business credit card bills and travel expenses for Calafati.

In ruling on Briscoe's motion for preliminary injunction, the Court ordered Travelers to advance Briscoe $1 million.

**22.** Exhibits 47, 48 and 49 were not offered into evidence for their truth.

In February 1984, Loeffler drafted hand-written calculations of what he believed Briscoe was entitled under the ADC. (Exh. 92). Loeffler's notes do not factor in interest or earnings. In fact, Loeffler achieved a negative number, indicating Briscoe would receive nothing under the ADC.[23] This document supports Travelers' current position that Briscoe owes money to Travelers under the ADC.

Sometime in the early Spring of 1995, Calafati prepared an estimate of Briscoe's Entitlement under the ADC. (Exh. 60). This document was first prepared in conjunction with Briscoe's application to this Court for additional funding under the ADC. This document is striking in several respects. First, this is the first time *any* document adds earnings on gross proceeds, for total earnings of $86,538,602. Second, the document also adds an *additional* 15% interest on net proceeds for additional earnings of $51,575,350. By adding interest on both gross *and* net proceeds, Calafati is able to create a fund of more than one hundred million dollars in interest! This creative math creates an entitlement to Briscoe under the ADC of $98,683,399 as of February 1995.

In sum, the post-execution conduct of the parties demonstrates that Travelers at all times acted as if the proceeds from the disposition of the collateral were its own. Travelers regularly transferred this money to suit its own corporate purposes. In addition, the post-execution conduct of the parties demonstrates that after the Program dragged on far longer than anyone anticipated, Briscoe began to search for ways to maximize its share. Briscoe's imaginative math, nearly a decade after entering into the ADC, is unreconcilable with the ADC and the documents preceding and succeeding its existence.

### H. The Trial Testimony

The trial in this matter lasted two days. Briscoe called Calafati and Loeffler to testify on its behalf. Travelers called Larner to testify on its behalf. The Court will review the testimony of each witness herein.

### 1. Howard Loeffler

Loeffler worked at Travelers from January 1, 1980 until the Fall of 1984. Loeffler worked in what was known as the workout unit. In early 1980 Loeffler was assigned to work exclusively on matters relating to Briscoe.

Loeffler testified that early on he saw signs of the deteriorating financial health of Briscoe. As a result, he met with Briscoe executives in March 1980. During these meetings, Briscoe expressed a need for a cash loan from Travelers. It was these discussions that led to Travelers loaning Briscoe $24 million under the Loan and Security Agreement.

At the same time as the parties executed the Loan and Security Agreement, Briscoe expressed a need for additional bonding from Travelers, according to Loeffler. Travelers, however, refused to write any new bonds for Briscoe.

In the summer of 1980, according to Loeffler, Travelers hired a consultant, Construction Management Associates ("CMA"), to gather information about Briscoe and to assess Travelers' financial exposure. The report by CMA suggested that Travelers faced a potential financial exposure for $45 million to $100 million or more. The CMA report analyzed forty Briscoe construction projects and found serious construction errors at many of the projects. As a result, Loeffler testified that he began having daily conversations with Briscoe in an effort to assess the situation. Loeffler testified that he expressed Travelers' concerns and did not get a satisfactory response from Briscoe.

In December 1980, Loeffler went to the Board of Directors of Briscoe to discuss the Briscoe situation. Loeffler testified that at this meeting he predicted that Travelers' financial loss would grow. He said he used the project in Las Vegas as an example of the poor work done by Briscoe. Loeffler testified he relied on the CMA analysis of the Las Vegas project, which described Briscoe's

---

**23.** This document directly contradicts Loeffler's testimony at trial that Briscoe is entitled to inter-   est. (See *infra* Section H.1).

work as "shoddy." However, the actual CMA report contradicts Loeffler's testimony. (Ex. 9). The CMA report states the following about the Las Vegas project: "The quality of the work is good." *Id.*

Briscoe was rightfully angered by the accusations leveled by Travelers that its work was below par. As a result, Calafati urged Loeffler to travel with him to Las Vegas to review the work done on the project. Loeffler testified that he consented and in January or February 1981, the two men visited the Las Vegas project. Loeffler testified that during this visit Calafati was able to refute each and every "error" listed by CMA in its report. Loeffler testified: "As far as I could see Briscoe had done excellent work." (Trial Tr. at 26).

The next morning Loeffler and Calafati met for breakfast. During this meeting Calafati again sought financial support from Travelers to complete on-going projects and conduct new projects. Loeffler testified that he agreed to this proposition because it was a "win-win" situation for both Travelers and Briscoe.

Shortly thereafter, Briscoe made a formal request for $30 million in new bonding from Travelers. Loeffler testified that he asked Briscoe to supplement its request with a formal business plan. In the Fall of 1981 Briscoe presented its business plan to Travelers. However, Travelers refused to issue $30 million in new bonds. Instead, Travelers offered Briscoe $10 million in new bonds. Calafati said that Briscoe did not have a business plan to accommodate $10 million in bonding. Therefore, Briscoe turned down Travelers' offer.

Loeffler testified that he became even more concerned about the financial health of Briscoe because Briscoe, as a result of turning down the $10 million in bonding, would not engage in any new construction work. Loeffler described the situation as "very difficult." He said he feared the best employees of Briscoe would soon leave the company and/or the company would go under. He testified that his main fear at that time was that Briscoe had no incentive to do good work or to maximize its existing claims.

As a result, Loeffler said he began to engage in negotiations with Briscoe with the goal of reaching some agreement that would mutually benefit both parties. It is these negotiations that led to the preparation and signing of the ADC. Loeffler testified that he and Calafati discussed several alternatives, including Briscoe immediately delivering all of its assets to Travelers, a joint venture and a partnership. Loeffler testified that all of these arrangements were rejected by Travelers because Travelers did not want to become the alter ego of Briscoe. Loeffler testified that Travelers also rejected the formation of an escrow account because it did not want to create a pot of money that could be attacked by third parties.

Loeffler said negotiations between Calafati and him continued on a daily basis until December 1981, when the parties reached a handshake agreement at the Parsippany Hilton Hotel in New Jersey. Loeffler testified that his understanding of the agreement was that the two parties would share equally in the money deposited under the ADC. He said the "heart of the conversation" was an agreement to maximize the benefits to both Travelers and Briscoe. (Trial Tr. at 37). He said the goal was to keep the creditor/debtor relationship and allow Briscoe to pursue third-party claims.

Loeffler testified that Travelers was to have "custody" of the funds and invest the funds for the benefit of both parties. He further testified that as the custodian of the funds, Travelers had an obligation to invest the funds. An investment of funds was the understanding of both Calafati and him at the time they reached their handshake agreement. Moreover, Loeffler testified that he specifically discussed with Calafati the issue of whether Travelers would invest the money on behalf of Briscoe. This testimony controverts Loeffler's prior deposition testimony. During his deposition Loeffler testified that he could not recall any specific conversation he had with Calafati on this issue. (Loeffler Dep. at 55).

When asked by the Court why the ADC does not expressly include any provision requiring Travelers to invest the funds, Loeffler testified that the language chosen was

designed to give the contract "flexibility, so that it wouldn't have to be only interest; it could be other ways of growing the proceeds." (Trial Tr. at 58). When asked why the word "earnings," which would encompass all types of growth on the proceeds, was not used in the ADC, Loeffler testified: "I believe this wording [of the ADC] is probably formal, probably something related to the UCC." *Id.* However, later in his testimony, Loeffler conceded that the UCC was never discussed during his negotiations with Calafati.

During cross-examination, Loeffler conceded that everything he discussed with Calafati is embodied in the final ADC agreement. He also conceded that the ADC is clear and unambiguous.

Curiously, Loeffler testified that Briscoe was not in default under the Loan and Security Agreement, until Travelers made a formal demand for payment of the principal several days before the ADC was executed. Loeffler testified that Briscoe's default was *not* a "concept" that drove the formation of the ADC, but rather a mere "technicality." (Trial Tr. at 99). Nonetheless, Loeffler, who is a lawyer by training, admitted that a creditor has stronger rights after default. He acknowledged that after a default a creditor can dispose of the collateral to first pay its expenses and then to pay down the debt.

The Court finds Loeffler's testimony troublesome and that it is entitled to very little weight. First and foremost, Loeffler's denial that Briscoe was in default under the Loan and Security Agreement flies in the face of the facts of this case. Second, Loeffler's description of the ADC as an agreement whereby Travelers and Briscoe each agreed to work together for their mutual benefit is contradicted by the language of the ADC and the drafting history of the ADC. Finally, Loeffler's insistence that the issue of interest was discussed and resolved during his negotiations with Calafati is refuted by the drafting history of the ADC and his prior deposition testimony.

### 2. Gabriel Calafati

Gabriel Calafati first began working for Briscoe in 1949 or 1950 as a helper to a field engineer. He steadily rose through the ranks until he reached his present position of chief executive officer, president and treasurer of Briscoe.

As discussed earlier, Calafati represented Briscoe in the negotiations of the ADC. Calafati testified: "*All* of the negotiations of the ADC [were] done directly between myself for Frank Briscoe and Howard Loeffler with regard to The Travelers." (Emphasis added). (Trial Tr. at 175). Calafati characterized the ADC negotiations as an effort by Briscoe and Travelers to work together for the benefit of both parties. He testified that Travelers wanted to minimize its bond liability as well as receive repayment of the $24 million that had been loaned to Briscoe. He testified that Briscoe wanted to vindicate its position on its third-party claims, repay Travelers and continue in the construction industry. Calafati said the negotiations of the ADC were an attempt to meet both the needs of Travelers and Briscoe.

Calafati testified that Loeffler and he examined several different concepts in an effort to reach these goals. Initially Travelers proposed to hire Calafati, but Calafati refused. Calafati testified that throughout the negotiations one of his main concerns was that Briscoe emerge as a viable company.

According to Calafati, one of Travelers' main concerns was that it "did not want to be in Briscoe's shoes" because Travelers feared liability to the third parties with whom Briscoe was litigating various construction claims. (Trial Tr. at 161). Specifically, Travelers feared that if Briscoe lost the third-party lawsuits, the claimants would attack Briscoe's assets before Travelers could be repaid. *Id.* "They weren't sure if Briscoe was right or wrong, and they just didn't want to stand in our shoes," said Calafati. *Id.*

After discussing numerous proposals, Briscoe and Travelers finally reached an agreement in December 1981. Calafati testified that prior to reaching this agreement he specifically discussed the issue of Briscoe sharing in any interest earned on the proceeds deposited under the ADC. Calafati testified that Briscoe's right to share in any interest on the funds was a "dealbreaker"—

that is, an issue which Briscoe felt was absolutely essential to any agreement:

> In December of '81, there was a dealbreaker. We were working towards an arrangement. We were close; a couple of things that I—we did not come up—had agreed before December. One was sharing: How much sharing are you going to do with Briscoe's money, how much would be applied to the debt, and how much money Briscoe would be able to retain.... And what I did is, because that was a dealbreaker, we agreed in December on a sharing arrangement of Briscoe's assets. What we agreed to do is give Briscoe 50% to hold onto, the other 50% of Briscoe's money to be applied to the debt. And if there was a surplus, it would come to Briscoe; and if there was a shortfall, there would be a forbearance.

(Trial Tr. at 165–66). Calafati testified unequivocally that he would not have signed the ADC if Travelers did not have the obligation to accrue interest on behalf of Briscoe:

> Q: And if you were not going to get the benefit of Travelers investing these proceeds, would you have made this deal?
>
> A: There would have been no deal. It would have been a different deal, probably, but this deal would not have happened, no.
>
> Q: Why is that?
>
> A: I would have never agreed to that. It doesn't even make sense. It doesn't make sense—
>
> Q: Why not?
>
> A: ... Travelers is charging us interest on the debt. Here, we are giving them proceeds and not putting the proceeds to pay off the debt, and they're not giving us the investment on the proceeds. It doesn't make sense. I mean, we'll never catch up under those purposes.

(Trial Tr. at 175–76). Calafati also testified:

> Afterwards, when we got into the discussions how we were going to accomplish it, Travelers—we finally agreed that Travelers would invest the money.... So what we agreed, then, is that, instead of Briscoe holding onto the money and investing the money and then sharing we agreed that the money will be turned over to Travel-

ers, put into their possession; they would invest the money for Briscoe, and then at the end, Briscoe's money would be shared. Fifty percent, again, would go to Briscoe to hold onto; the other 50% will go to pay off the debt. If there was anything left over the surplus came to us and if there was a shortfall it would be forbeared. And, that's the way we ended up agreeing on it.

(Trial Tr. at 169–170). When asked about his understanding of how Briscoe's share would be calculated, Calafati testified:

> We discussed that Briscoe would turn over the proceeds, Travelers would invest them, Travelers would advance us the funds from their own money, and at completion, it would take the proceeds, plus the investments, less the total cost of advances to do the program, and that we would share that on a 50–50 basis, which was Briscoe's money. Fifty percent would be held by Briscoe, and 50 percent would be applied to the debt.

(Trial Tr. at 171). On cross-examination, Calafati said this specific discussion took place at a meeting in April or May of 1982 between Calafati, Kelly, Loeffler, Larner and Pepe. (Trial Tr. at 200–01).

When asked about language in the ADC that states that Travelers can "utilize as its own" the proceeds deposited under the ADC, Calafati testified that he understood this language to give Travelers freedom to invest the money as it saw fit. Calafati testified that this language did not, to his way of thinking, vest ownership of the proceeds with Travelers.

When asked what portion of the ADC requires Travelers to invest the proceeds on behalf of Briscoe, Calafati pointed to the language in Paragraph 10.4 referring to "accessories, substitutions, additions, replacements accessions and increments thereto." Calafati testified that this language *implies* that Travelers had a duty to invest the proceeds on behalf of Briscoe. Moreover, Calafati testified that this particular language was selected for use in the ADC, because "exactly the same" language appears in the Loan and Security Agreement. Calafati testified: "I guess if they used 'interest' in the

Loan and Security Agreement, they would have used 'interest' in this agreement, but it meant the same thing." (Trial Tr. at 184).

On cross-examination, Calafati stated emphatically that at the time Briscoe and Travelers entered into the ADC, Briscoe was *not* in default under the Loan and Security Agreement. Calafati said: "We were never in default." (Trial Tr. at 203). Calafati said that language in the ADC stating that Briscoe was in default was a mere technicality. (Trial Tr. at 205).

Further, on cross-examination Calafati testified that the ADC is clear and unambiguous and fully expresses all of the terms agreed to by the parties. (Trial Tr. at 190–91). He testified that he never heard anybody at Briscoe ever state that the ADC was ambiguous. (Trial Tr. at 191). He specifically denied receiving a memo from William Kelly in 1989 suggesting that the ADC was ambiguous and Briscoe could use the ambiguity to get more money from Travelers. (Trial Tr. at 193).

On cross-examination, Calafati insisted that Travelers agreed to "maximize" the money deposited by Briscoe under the ADC. (Trial Tr. II at 28–29).[24] Calafati said that Travelers had the discretion to "maximize" the funds in any manner it saw fit. *Id.* Yet, at the same time Calafati said that Travelers could not invest the money in Texas real estate. (Trial Tr. II at 30). In fact, Calafati said he specifically discussed with Loeffler that the money could not be invested in real estate. *Id.* Moreover, Calafati said that under the ADC Travelers agreed to get Briscoe's approval prior to picking a manner of investment:

> Travelers, when we made the agreement with regard to investments, it was agreed that they're going to invest the money, it was agreed that they would basically follow the procedures in the Loan and Security Agreement, and that under the Loan

and Security Agreement, the way it was set is that we would agree on the investments, and if we couldn't agree on the investments, we go into sure things, such as CDs and Treasury Bills. And that's the way it was agreed.

(Trial Tr. II at 36). Moreover, Calafati testified that Briscoe sent one or more letters to Travelers requesting information on how the money deposited under the ADC was being invested. (Trial Tr. II at 41). Later, under further questioning, Calafati admitted: "I don't believe there is such a letter." [25] (Trial Tr. II at 42).

The Court finds Calafati's testimony to be unpersuasive. First and foremost, the Court is astonished that Calafati would deny that Briscoe was in default under the Loan and Security Agreement. Briscoe's default under the Loan and Security Agreement is the pivotal event that fueled all of the subsequent events, including the negotiation and consummation of the ADC.

Second, Calafati's testimony that he and Loeffler negotiated the ADC by themselves is patently false. The drafting history of the ADC shows that attorneys for both Briscoe and Travelers were heavily involved in the ADC negotiations.

Third, Calafati's description of the ADC and his interpretation of its content contradicts the actual ADC. For example, Calafati described the ADC program as requiring "that the money will be turned over to Travelers, put into their possession; they would invest the money for Briscoe, and then at the end, Briscoe's money would be shared." Nothing in the ADC reflects this. Nowhere in the ADC is there any language requiring Travelers to invest the money. Calafati's testimony that the ADC does not expressly provide for Travelers to invest the funds because the language in the ADC mirrors the language in the Loan and Security Agreement is incorrect. The Loan and Security

---

**24.** References to "Trial Tr. II" are to Volume II of the Trial Transcript.

**25.** Calafati's statement that Briscoe sent letters to Travelers requesting information on how the money deposited under the ADC was being invested is clearly false. No such letters were ever produced in this litigation. Counsel for Bris-

coe's citation to Exhibits 47 through 50 is inaccurate. Exhibits 47 through 50 are letters from Briscoe to Travelers requesting an estimation of Briscoe's entitlement under the Program. These letters do not request information on how Travelers is investing the money.

Agreement specifically refers to "interest" in several places. (Exh. 5).

Fourth, Calafati's testimony that Travelers needed Briscoe's approval before investing the money is directly contrary to the ADC, which allows Travelers to place the money in its "sole and absolute discretion." The drafting history of the ADC also shows that Travelers inserted this language in the ADC specifically to depart from the Loan and Security Agreement, which required Travelers to seek Briscoe's approval for investments. Moreover, Calafati's own trial testimony was internally contradictory on this point. When asked about language in the ADC that states that Travelers can "utilize as its own" the proceeds deposited under the ADC, Calafati testified that he understood this language to give Travelers unrestricted freedom to invest the money as it saw fit. Yet, later, Calafati said Travelers could not make investments without Briscoe's approval.

Fifth, Calafati's description of the negotiations of the ADC conflicts with the documents submitted to the Court which map the parties' negotiations. For example, Calafati testified that prior to signing the ADC, he specifically discussed the issue of Briscoe sharing in any interest earned on the proceeds deposited under the ADC. However, none of the documents submitted to the Court reflects such negotiations. Calafati also testified that there was a meeting in April or May of 1982 between Calafati, Kelly, Loeffler, Larner and Pepe during which the subject of interest was discussed. Yet, none of the documents submitted in this case reflects such a meeting. Moreover, Calafati testified that Briscoe's right to share in any interest on the funds was a "dealbreaker"—that is, an issue which Briscoe felt was absolutely essential to any agreement. However, Exhibit 75 shows that Briscoe chose to stop fighting for several provisions in the ADC.

Sixth, Calafati's testimony that he would never have signed the ADC, but for a provision that requires Travelers to invest the proceeds on behalf of Briscoe, because the program "doesn't make sense" without such a provision is refuted by the facts. In return for turning over its assets to Travelers, Briscoe received more than $40 million in interest-free loans from Travelers and additional loans that were interest-free for eighteen months. Therefore, even though Briscoe's $24 million debt was accruing interest at prime plus one-half percent, Briscoe was receiving millions of dollars interest-free from Travelers. Thus, the program does "make sense" even without a provision that requires Travelers to invest the proceeds on behalf of Briscoe. Additionally, this program "makes sense" because it was at the time Briscoe's only alternative to near-certain bankruptcy.

For all of these reasons, the Court finds Calafati's testimony—in its entirety—is unworthy of belief.

### 3. Mark Larner, Esq.

Mark Larner is a principal at the law firm Budd, Larner, Gross, Rosenbaum, Greenberg & Sade in Short Hills, New Jersey. His law firm has represented Travelers for the past twenty years. Larner was the partner responsible for drafting the ADC.

Larner testified that the structure and language of the ADC follows the UCC.[26] That is, the ADC is designed to articulate the rights of a secured creditor after default by the debtor. (Trial Tr. II at 79). Larner described the ADC as follows:

> The Loan and Security Agreement established the relationship of debtor-creditor, and secured creditor, because it was a secured loan which predates the default by the debtor. The ADC represented an agreement between Travelers and Briscoe pursuant to which Travelers agreed to engage Briscoe for the purposes of acting in a capacity to collect and dispose of that which was then to be turned over to Travelers to be liquidated. So the difference is, one represents the relationship of debtor-creditor prior to default; the other represents the relationship between two parties after there is a default and exercise[ ] by

---

**26.** However, Larner testified that the parties never discussed the applicability of UCC § 9–207, discussed *supra*. (Trial Tr. II at 82).

the secured creditor of its rights and remedies with respect to the collateral. (Trial Tr. II at 79–80).

He testified that during the negotiations of the ADC one of Briscoe's proposals was "that the relationship not change." (Trial Tr. II at 80). That is, Briscoe sought to extend the parties' status under the Loan and Security Agreement. Specifically, Briscoe proposed an agreement under which Briscoe would not be declared to be in default and Travelers would not exercise its rights as a secured creditor.[27] "That position was not one which Travelers would agree to," according to Larner. (Trial Tr. II at 80, 84).

Larner testified unequivocally that the issue of whether Travelers would accrue interest on Briscoe's behalf was specifically discussed by the parties and Travelers rejected this proposal:

Q: Did you ever have a conversation with Mr. Calafati at any time before the ADC was signed in which [he] told you in the presence of others that there had to be interest added to the proceeds realized from the collection and/or disposition of collateral, and that such interest would then be accumulated onto those proceeds in order for there to be deal?

A: No. The interest issue was Briscoe's desire, demand that it receive interest on that portion of the net proceeds to which it would become entitled at the end of the program. And there was a significant discussion with regard to those issues, and those issues focused ultimately on the establishment of an estimation [formula] with certain reserves. . . .

(Trial Tr. II at 89–90). Thus, Larner testified that Travelers expressly rejected Briscoe's proposal for interest. Instead, the parties negotiated a provision, embodied in ADC Paragraph 9.4, by which Travelers, after eighteen months, would estimate the amount due to Briscoe, subtract certain reserves, and then, if the balance were positive, either pay

the balance to Briscoe or accrue interest at a rate of 15% per annum. A snapshot of Larner's testimony on this issue is as follows:

Q: Did you ever have a conversation with anyone at any time in the course of the negotiations prior to the execution of the ADC in which you were instructed to provide in the agreement for the accumulation or accretion of interest on proceeds realized from the collection and/or disposition of collateral?

A: No.

Q: Did the parties agree to any surrogate or code or secret word or expression for interest, other than that which you've testified to is contained in the periodic estimates of Briscoe's indicated net proceeds entitlement?

A: No.

Q: Were there any discussions in the course of the negotiations for the ADC about making the contract or the agreement itself vague or indefinite or hard to read in order to obscure Briscoe's interest, ownership or entitlement to anything thereunder?

A: Hardly. The effort was made, what the result was may be another story, but the effort was made to make it as clear as possible.

Q: Were there any discussions during the negotiation of the ADC about making the contract vague or indefinite or ambiguous in order to hide the source of the funds that were being realized . . . from the collection and/or disposition of collateral that were being turned over to Travelers by Briscoe?

A: No. The agreement is explicit that funds that are being turned over come from the disposition of the collateral.

Q: Was there any discussion at all in the course of the negotiation of the ADC about disguising the true deal that was made in terms of its embodiment in a document?

A: No.

---

27. Larner testified that the first event of default occurred when Briscoe failed to make the first monthly interest payment under the Loan and

Security Agreement, "30 days after March of 1980." (Trial Tr. II at 85).

Q: Was there any effort in the course of the preparation of the ADC or in the discussions about it to dissemble or to try to prevent the illumination of the target and to throw third parties off the scent of what the agreement truly provided?

A: No.

(Trial Tr. II at 90–91).

Larner also refuted Briscoe's argument that the word "realized" in the ADC encompasses the word "interest." Larner testified that he used the word "realized" in drafting the ADC to be synonymous with the words "actual receipt." (Trial Tr. II at 92). Larner testified: "If I intended to [provide for] interest on gross proceeds, I would have been very explicit about both defining it, how you go about providing for it, and how it is disposed of, as I think I did with respect to the interest calculations that are made under [Paragraph] 9.4 in terms of how it was calculated and how and if it is paid, and to whom it is to be paid to." (Trial Tr. II at 93).

The Court finds Larner's testimony to be highly convincing. Larner's explanation of the ADC is entirely consistent with the language and structure of the ADC. Moreover, Larner's discussion of the negotiations of the ADC is consistent with the drafting history documents submitted to this Court. The one area of Larner's testimony that is somewhat awry are his comments regarding Travelers' lack of concern for third-party claims. During trial, Larner testified that he did not make the ADC deliberately vague in order to hide funds from third-party claimants. However, in his affidavit Larner states he eliminated the escrow account concept "because, *inter alia,* Briscoe at the time was the defendant in a significant litigation concerning a project it had constructed in Fort Wayne, Indiana. If Briscoe were to be held liable in the matter, the Fort Wayne plaintiff ('One Summit Square') could potentially seek recovery from the escrow account, thereby jeopardizing Travelers' full or partial interest in the portion of the liquidation proceeds held therein." (Larner Aff. ¶ 23). The Court finds, in light of the totality of Larner's testimony, this difference is inconsequential. Travelers' alleged fear of third-party claimants was not a driving force behind the formation of the ADC. Certainly, Briscoe's third-party claimant theory is not a sufficient basis for implying terms that do not appear in an unambiguous contract.

## THE FALLACY OF BRISCOE'S POSITION

Briscoe's argument that it is entitled to receive interest on proceeds deposited under the ADC is rooted in a fundamental error. Briscoe mischaracterizes the proceeds deposited under the ADC as merely collateral. The difficulty with this characterization, however, is that Briscoe must perforce deny the undisputable fact that it defaulted on its obligations under the Loan and Security Agreement. Briscoe's argument is built on a straw house: the premise that *if* there had *not* been a default, Travelers would not be entitled to dispose of the collateral, and, to the extent that any collateral had been converted into cash, those proceeds would retain the status of collateral and Travelers would be required to hold this collateral and suitably invest it. Briscoe, however, is bound by the reality of its default. There can be no question that Briscoe defaulted under the Loan and Security Agreement when Briscoe failed to timely make monthly interest payments and failed to timely repay the principal upon demand from Travelers. (Larner Aff. ¶ 4). Briscoe's default was explicitly recited in the preamble to the ADC and the contemporaneous Execution Memorandum, which Briscoe signed and which Briscoe now seeks to enforce. (ADC at 3; Ex. 2). As a result of its default under the Loan and Security Agreement, Briscoe is barred from claiming that the money deposited under the ADC is merely collateral securing the loans. The fact is, the money deposited under the ADC is the proceeds from the liquidation of the collateral. All of the case law and statutory authority relied on by Briscoe, likewise, becomes meaningless when contrasted against the background of reality. The cases and statutes relied on by Briscoe all deal with the duties of pledgee and pledgor. None of the authority cited by Briscoe deals with the rights of a secured creditor after a debtor has defaulted.

There can be no dispute that once a debtor defaults on a secured loan, those assets must either be transferred to the secured creditor, or, in the words of the Uniform Commercial Code, be "disposed of" for reduction of the debt. Accordingly, the UCC makes clear that cash generated by the "disposition" of collateral belongs to the secured creditor, who must apply the proceeds first to repay itself for expenses of the liquidation process and then to the reduction of the debt. The secured creditor must account to the debtor for any surplus; and the debtor remains liable for any deficiency. *See*, UCC 9–504; R.A. Anderson, *The Uniform Commercial Code*, § 9–504:198 at 585 (3d ed. 1994) ("When the proceeds of sale are not sufficient to pay the debt of the secured creditor who has priority, the creditor is entitled to keep all of the proceeds.").

These principles govern the instant lawsuit. Briscoe defaulted under the Loan and Security Agreement. The money deposited under the ADC was not collateral but was the proceeds of the liquidation of Briscoe's assets. As such, the money deposited under the ADC belongs to Travelers who must apply the money first to cover its expenses and loans to Briscoe and then to the debt. If there is a surplus, Travelers must account to Briscoe. If there is a deficit, Travelers will forbear.[28]

Having reviewed the language of the ADC as well as the pre-execution conduct and post-execution conduct of the parties and the trial testimony, the Court now makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Plaintiff Frank Briscoe Co., Inc. is a New Jersey corporation.

2. Defendant The Travelers Indemnity Company is a Connecticut corporation.

3. The ADC was the product of more than a year of intense negotiations between Travelers and Briscoe.

4. Both sides were represented by counsel during the negotiations.

5. Travelers' officer-in-charge, Loeffler, negotiated the agreement on behalf of Travelers.

6. Briscoe's then executive vice-president, Calafati, negotiated on behalf of Briscoe.

7. The scrivener of the ADC was an attorney, Larner.

8. Travelers loaned Briscoe more than $24 million pursuant to a series of agreements, known collectively as the "Loan and Security Agreement."

9. Briscoe pledged all of its assets as security under the Loan and Security Agreement.

10. Travelers was the pledgee of all of the assets of Briscoe under the Loan and Security Agreement.

11. Briscoe defaulted on its repayment obligation under the Loan and Security Agreement.

12. After Briscoe defaulted under the Loan and Security Agreement the status of the parties changed. Briscoe was no longer a pledgor and Travelers was no longer a pledgee of Briscoe's assets. Rather, upon default Travelers, as secured creditor, became the owner of the proceeds from the liquidation of Briscoe's assets.

13. The Court rejects the testimony of Loeffler and Calafati that indicates they discussed the issue of interest during their negotiations. The documents that detail the drafting history of the ADC refute their testimony.

14. The Court rejects the testimony of Calafati that he would not have signed the ADC if he knew Briscoe would not share in the interest earned on the proceeds from the disposition of the collateral. The documents detailing the drafting history of the ADC rebut this testimony. The drafting history specifically shows that Briscoe tried to incorporate these terms into the ADC, but was unsuccessful.

15. The parties executed the ADC on August 2, 1982.

16. The ADC establishes a "Program" pursuant to which Briscoe would assist Trav-

---

**28.** The Court recognizes that Travelers must forbear any deficiency pursuant to the ADC.

elers in the liquidation of its assets by collecting on third-party construction claims and liquidating certain tangible assets.

17. The ADC provides that Travelers would hire Briscoe as its agent to assist in the liquidation of Briscoe's collateral.

18. The ADC does *not* make Travelers the fiduciary of Briscoe with respect to collateral disposed of by Briscoe.

19. The ADC provides that Briscoe would deposit all of the proceeds from the liquidation of its assets in a single bank account owned by Travelers.

20. Travelers is the owner of all money deposited in this bank account under the ADC.

21. The ADC provides that Travelers, as the owner of the money deposited under the ADC, is entitled to keep any interest or earnings on this money.

22. Briscoe is not entitled to any interest or earnings on the money deposited under the ADC.

### CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction pursuant to diversity of citizenship of the parties under 28 U.S.C. § 1332.

2. The parties accept the Court's personal jurisdiction.

3. The parties accept that venue lies in this district.

4. The ADC is unambiguous.

5. The ADC is not a contract of adhesion.

6. The ADC is the complete expression of the agreement reached between Travelers and Briscoe.

7. Under the ADC, Travelers is a secured creditor and Briscoe is a defaulting debtor.

8. UCC § 9–207 does not govern the ADC because the parties have chosen to contract around it and because the debtor has defaulted. UCC § 9–207 applies when a pledgee holds collateral on behalf of pledgor.

9. As a secured creditor of a defaulted debtor, Travelers is the owner of all collateral deposited by Briscoe under the ADC.

10. Travelers is not a fiduciary under the ADC. Briscoe is not entitled to interest on the disposition of collateral proceeds.

11. A judgment shall be entered in favor of The Travelers Indemnity Company in conformity with this Opinion.

An appropriate Order is attached.

### *ORDER & JUDGMENT*

In accordance with the Court's Opinion filed herewith,

It is on this 5th day of September, 1995,

ORDERED that defendant The Travelers Indemnity Co. ("Travelers") is not a fiduciary under the Agreement for Disposition of Collateral ("ADC"); and it is further

ORDERED that under the ADC, Travelers hired plaintiff Frank Briscoe Co., Inc. ("Briscoe") as its agent to assist in the disposition of the collateral; and it is further

ORDERED that Travelers, as a secured creditor of a defaulted debtor, owns all of the money deposited by Briscoe under the ADC; and it is further

ORDERED that Travelers has no duty under the ADC to accrue on behalf of Briscoe interest or earnings on the money deposited by Briscoe under the ADC.